**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

**SEYED REZA MINAEY** PETITIONER

**v.** **No. 5:26-cv-98-BJB**

**ADAM SMITH, ET AL.** RESPONDENTS

* * * * *

## OPINION AND ORDER

Seyed Reza Minaey faces a conundrum. He may not remain in this country, but (for now at least) has nowhere else to go. Back in the 1980s, an immigration judge found him deportable and ordered him to leave. Petition (DN 1) ¶¶ 3–5; IJ Order (DN 1-4) at 9. But instead of complying by "voluntar[il]y depart[ing]," Minaey remained in the United States; he says he feared political persecution should he return to his native Iran. ¶¶ 7, 26. Since the '80s, he has lived here. ¶ 9, 33.[1] In July 2025, though, ICE agents arrested and detained him pending removal thanks to the old removal order and his criminal history (mostly DUIs). ¶ 11; Detention Decision (DN 1-7) at 1–2; Criminal Record (DN 1-14). Removing Minaey to Iran would be difficult, to say the least. "ICE and Iran are negotiating for his return" but haven't gotten far. Return (DN 11) at 4; Declaration of Carly Schilling (DN 11-3) ¶ 6. Even setting aside broader diplomatic difficulties between the two countries, questions specific to Minaey's case further complicate removal efforts. ICE officers "requested travel documents" for Minaey, but Iranian officials have apparently declined to issue them unless and until they can "verify [Minaey's] citizenship"—which requires "a birth certificate" seemingly not in the Government's hands. Schilling Decl. ¶¶ 6–7. The Government's response illuminated nothing about when or how this impasse will end—much less whether removal flights are even tenable at this geopolitical moment. So for the time being, Minaey has nowhere to go.[2] The

---

[1] During this time, Minaey unsuccessfully sought a U Visa. *See* Denial Order (DN 25-1) at 1.

[2] Generally, "arriving aliens" are removed to the country from which they came. If that country is "unwilling to accept the alien," however, the Government may send the alien to his country of citizenship, birth, or residence—or, if those options are "impracticable, inadvisable, or impossible," to another country (setting aside Convention Against Torture concerns such as those at issue here). 8 U.S.C. § 1231(b)(1). Other aliens may choose where they'd like to go, subject to broad statutory and regulatory leeway by which the Government

Government apparently hasn't attempted removal to a third country, either; its efforts have focused on getting Minaey back to Iran.

This pre-removal limbo is particularly acute because Minaey is *detained* pending removal. Since July 2025, the Government has held him—based on his criminal history and removable status—rather than releasing him back into this country.

More problematic still is when that detention persists for months, even years, without an end in sight. After more than 12 months in custody with no firm removal date, Minaey has asked for release through a writ of habeas corpus. His petition and accompanying filings in this Court assert that the Government may not (or at least may no longer) constitutionally detain him while it tries to facilitate his removal—to Iran or elsewhere. In Minaey's view, he "has a liberty interest in not being detained for an indeterminate length of time by the Attorney General," and detention is both statutorily unauthorized and constitutionally troublesome when it persists beyond six months without a removal date. Petition ¶¶ 45, 40–42. Because the Constitution circumscribes the Government's authority to detain, he maintains, the courts must enforce that limit by ordering an end to the unauthorized detention.

Whether someone in Minaey's shoes may be detained in anticipation of their removal—while the timing of that removal remains speculative—is a difficult question. *Cf. Rosales-Garcia v. Holland*, 322 F.3d 386, 412–13 (6th Cir. 2003) (en banc) (describing the "difficult" situation of "criminal aliens whose removal cannot be effected"). The statutes enacted by Congress and implemented by the Executive sit in uncomfortable tension with the interpretation given that scheme, in the shadow of the Due Process Clause, by the Supreme Court—some of whose decisions are themselves in tension with one another.

### A. The Law of Pre-Removal Detention

Almost all of the law governing the detention of immigrants pending their removal springs, directly or indirectly, from two constitutional provisions. One authorizes Congress "[t]o establish a uniform Rule of Naturalization." Art. I, § 8. Another constrains Congress from depriving any "person" of his "liberty … without due process of law." Amend. V.

---

may reject the alien's preferred destination—which partially incorporates the same "impracticable, inadvisable, or impossible" standard—because "removing the alien to the [preferred] country is prejudicial to the United States." § 1231(b)(2). *See also* 8 C.F.R. § 208.16(f) ("Nothing in this section … shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred."); § 208.17(b)(2) ("the alien may be removed at any time to another country where he or she is not likely to be tortured").

The Supreme Court has interpreted the Due Process Clause to impose at least some limitations on Congress' power to regulate immigration. The Due Process Clause requires the Government, for instance, to afford aliens "due process of law in the context of removal proceedings." *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (quoting *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025)). "'[N]o person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *Id.* (quoting *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903)). But those precedents concern a procedural protection against improper removal, not a substantive right to release before a proper removal.

This procedural protection against removal without a hearing, moreover, shouldn't be confused with a substantive right to release within the country. The Sixth Circuit, like the Supreme Court, has implicitly rejected the theory that an alien enjoys "permi[ssion]," under the Due Process Clause, "to live in this country simply because" his "country of origin will not have [him] back." *Rosales-Garcia*, 322 F.3d at 412. Indeed, some Justices have expressly rejected the theory. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 703 (2001) (Scalia, J., dissenting) ("[A]n inadmissible alien at the border has no right to be in the United States."). And no Supreme Court or Sixth Circuit decision appears to have ever accepted it.

Recognizing such an extra-textual entitlement would be difficult to reconcile with Congress' express power "[t]o establish an uniform Rule of Naturalization." U.S. CONST., Article I, § 8. Congress wields "plenary authority" over immigration law, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020), which entails both the authority to exclude as well as the concomitant power to provide for removal. "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953).[3] The prerogative to deport, in turn, implies another to detain: "Proceedings to exclude or expel would be vain if those accused could not be held in custody … while arrangements were being made for their deportation." *Wong Wing v. United States,* 163 U.S. 228, 235 (1896); *accord Demore v. Kim*, 538 U.S. 510, 531 (2003). And in making these arrangements, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Reno v. Flores*, 507 U.S. 292, 305–06 (1993) (quotation marks omitted).

---

[3] *See also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.").

How has Congress exercised that authority here? In the main, aliens should be removed within 90 days after a removal order issues. 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days"). As noted above, however, prompt removal is not always feasible. And Congress, in § 1231(a)(6), "se[t] no limit on the length of time" someone "may be detained." *Zadvydas*, 533 U.S. at 689 (quotation marks omitted).[4] Congress instead provided simply that aliens who are dangerous or likely to flee "may be detained beyond the removal period." § 1231(a)(6).

Put simply: the Constitution recognizes Congress' plenary power to regulate immigration, Congress has used that power to authorize the Executive Branch to detain aliens (at least those adjudged safety or flight risks) until their removal, and the Supreme Court has never recognized a substantive due-process right for aliens to live in this country without congressional approval.

Nevertheless, a quarter-century ago the Supreme Court held that the Executive Branch cannot indefinitely detain an alien pending his removal. In *Zadvydas*, the Court approached the "serious question" whether "the Constitution permits detention that is indefinite and potentially permanent." 533 U.S. at 696. Rather than answer directly, the Court read § 1231(a) in a manner that, to the majority, avoided a close constitutional question. "[A]liens that the Government finds itself unable to remove," the Court held, may not "be condemned to an indefinite term of imprisonment within the United States." 533 U.S. at 695. The Court admittedly didn't read the statute to "mea[n]" what it literally says," which would've left the release decision up "to the Attorney General." *Id.* at 689 (quotation marks omitted). Instead the Court adopted an interpretation that rested, at least in part, on doubts about whether indefinite detention was reconcilable with the Due Process Clause. *See id.* (citing, *e.g.*, *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The Court instead construed the statute to allow detention only so long as "removal is reasonably foreseeable." *Id.* at 700. "[A]n alien may," therefore, "be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701.

To implement this "reasonableness" standard, *Zadvydas* constructed a burden-shifting framework. After the 90-day removal period set forth in § 1231(a)(1)(A), the Government may continue to detain an alien who poses a flight risk or a "danger to

---

[4] In full, that subsection provides: "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

the community." *Zadvydas*, 533 U.S. at 690–91. But only for "six months." *Id.* at 701 ("We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months."). The Court borrowed this interval from the legislative history of statutes composing the pre-IIRIRA detention regime that ended in 1996, decisions recognizing the constitutional jury-trial right, and the need for "uniform administration in the federal courts." *Id.* If six months pass without departure from this country, an alien may "provid[e] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If he does, "the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* If the Government cannot meet this burden, *Zadvydas* requires a trial judge to order the alien's release—without heed to his status as a flight risk or danger to society. *See id.* at 697 (denying "congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed," "whether [or not] protecting the community from dangerous aliens is a primary … statutory purpose").

By limiting the Government's power to detain, therefore, *Zadvydas* arguably and implicitly created a corresponding individual right to freedom *from* detention. Justice Scalia anticipated as much 25 years ago, observing that the Court had never recognized such a right in the immigration context. A "criminal alien under final order of removal … has no right to be in the United States." *Id.* at 702–03 (Scalia, J., dissenting). But if he "allegedly will not be accepted by any other country in the reasonably foreseeable future," he may in effect "clai[m] a constitutional right of supervised release into the United States." *Id.* Despite the lack of any entitlement under positive law to a "right of release into this country," then, one becomes available to "an individual who *concededly* has no legal right to be here." *Id.* ("There is no such constitutional right," whether "repackaged as freedom from 'physical restraint' or freedom from 'indefinite detention.'"). This rule, Justice Scalia observed, is difficult to reconcile with earlier decisions. *Id.* ("We are offered no justification why an alien under a valid and final order of removal—which has *totally extinguished* whatever right to presence in this country he possessed—has any greater due process right to be released into the country than an alien at the border seeking entry."). *See also* Memorandum from John Ashcroft to Acting INS Comm'r, 66 Fed. Reg. 38433 (July 24, 2001) (noting the "anomal[y] in which individuals who have committed violent crimes will be released from detention simply because their country of origin refuses to live up to its obligations under international law").[5]

[5] *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), for instance, squarely denied a detainee's right to release into the country. Yet it "st[ood] unexplained and undistinguished by the Court's opinion." *Zadvydas*, 533 U.S. at 704 (Scalia, J., dissenting).

Aside from these doctrinal concerns, Justice Kennedy's *Zadvydas* dissent raised additional practical ones that recur in cases like Minaey's. "Concepts of flight risk or future dangerousness are manageable legal categories" falling within the usual scope of judges' work. 533 U.S. at 725 (Kennedy, J., dissenting) (citing *Kansas v. Hendricks,* 521 U.S. 346 (1997), and *Foucha v. Louisiana,* 504 U.S. 71 (1992)). But discerning whether removal is "reasonably foreseeable" requires trial judges to gaze past the factual and legal determinations that resolve most domestic detention disputes. International diplomacy, logistical burdens, and more can delay or deny efforts to remove an alien. In the ordinary case, these "are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). And insofar as they involve diplomatic relations with other countries, they "fal[l] peculiarly within the province of the executive department." THE FEDERALIST No. 72, at 486 (Jacob E. Cooke ed., 1961) (Hamilton); *accord Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (citing *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Requiring courts to account for them thus presses judges into territory usually occupied by the political branches. As Justice Kennedy put it, "repatriation negotiations, one would have thought, are the paradigmatic examples of nonjusticiable inquiry." *Zadvydas*, 533 U.S. at 725. Applying the *Zadvydas* procedure, however, "require[s] the Executive Branch to surrender its primacy in foreign affairs and submit reports to the courts respecting its ongoing negotiations in the international sphere. High officials of the Department of State," for instance, "could be called on to testify as to the status of these negotiations." *Id.* (quotation marks omitted).

---

There the Court rejected a constitutional entitlement to release based upon the so-called "entry fiction": "[A]n alien on the threshold of initial entry," the Court has long recognized, "stands on a different footing" than an alien residing within the country. 345 U.S. at 212. Those on the threshold are entitled, as a matter of due process, only to "[w]hatever … procedure" Congress may offer. *Id.* (quotation marks omitted). And *Mezei* applied that standard, rather than a fuller set of due-process protections afforded resident aliens, to a person who arguably *did* pass the threshold after disembarking at Ellis Island. *See id.* at 213.

Although Minaey isn't waiting at the border like Mezei, Justice Scalia's observation applies all the same here: an alien under a removal order has no right under domestic law to release into the United States. All nine justices agreed on that much in *Mezei*, notwithstanding the dissenters' view that an alien detained at the border should receive a hearing ahead of permanent detention. *See Mezei*, 345 U.S. at 222–24 (Jackson, J., dissenting) ("Due process does not invest any alien with a right to enter the United States, nor confer on those admitted the right to remain against the national will. … Detention of an alien would not be inconsistent with substantive due process, provided … he is accorded procedural due process"). *See also Thuraissigiam*, 591 U.S. at 139–40 (Congress' plenary power over immigration "would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil").

Even setting aside concerns of institutional competence, *Zadvydas*'s two-step burden-shifting analysis turns on several difficult questions. Once six months of detention have elapsed, has the petitioner "provid[ed] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future"? *Id.* at 701. If so, has "the Government … respond[ed] with evidence sufficient to rebut that showing"? *Id.* Based on both sides' evidence, does detention ultimately "remain reasonable"? *Id.*

These questions, vexing even as posed by the Supreme Court, spawn still more for the Government and (frequently *pro se*) detainee at the trial-court level. What kind and amount of "evidence" must a petitioner offer to make the threshold "showing" that removal isn't reasonably foreseeable? *Id.* What sort of Government evidence can "rebut" that showing? *Id.* Must "the reasonably foreseeable future" be measured relative to the Court's six-month presumption, the statute's 90-day period, or some other metric? *Id.* *Zadvydas* suggested the equilibrium may be dynamic: "as the period of prior postremoval confinement grows, the 'reasonably foreseeable future' … shrink[s]." *Id.* And is the chief concern "indefinite" or instead "potentially permanent" detention? *Id.* at 696 (doubting whether "the Constitution permits detention that is indefinite *and* potentially permanent") (emphasis added). The difference may prove dispositive: although the delay preceding third-country removal may often end at an unknown time at the behest of unknown actors, that doesn't necessarily mean it's *infinite*.

Responding to at least some of these concerns, the Government promulgated a rule that implemented *Zadvydas* by providing for Executive Branch determinations of the likelihood of removal. 8 C.F.R. § 241.13 establishes a procedure that assesses the likelihood and timing of an alien's removal. The process culminates in a "written decision" by a special USCIS unit regarding whether "there is no significant likelihood that the alien will be removed in the reasonably foreseeable future." If not, the regulation requires "release … subject to appropriate conditions." *Cf. Rosales-Garcia*, 322 F.3d at 412 ("As the *Zadvydas* Court explained …, '[t]he choice ... is not between imprisonment and the alien "living at large." It is between imprisonment and supervision under release conditions that may not be violated.'"). Habeas litigation like this, however, shortcuts the agency process and transfers discretion to decisionmakers with less insight into removal delays. *See Zadvydas*, 533 U.S. at 688 (identifying habeas "as a forum for statutory and constitutional challenges to post-removal-period detention"); *J.G.G.*, 604 U.S. at 672 (identifying habeas as "the only cause of action available to challenge deportation under immigration statutes that [otherwise] preclud[e] judicial intervention") (cleaned up).

Importantly, the Supreme Court has refused to extend *Zadvydas*'s "notably generous" holding from a cautious reading of § 1231(a) to a direct interpretation of the Due Process Clause. *Jennings v. Rodriguez*, 583 U.S. 281, 299–301 (2018)

("*Zadvydas* represents a notably generous application of the constitutional-avoidance canon," and its reasoning is "inapt" in the context of various other statutory provisions). Nor has the Court extended its prophylactic construction of § 1231(a) to other statutory provisions. *See, e.g.*, *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 582 (2022) (reversing court of appeals for "impos[ing]" "detailed procedural requirements" that "reach substantially beyond the limitation on detention authority recognized in *Zadvydas*"). The uneasy relationship between this precedent and others has caused even otherwise supportive commenters to wonder that "*Zadvydas* … seems deliberately obscure (or completely unconvincing) on why these aliens, ruled deportable in orders that had long since become final and were no longer contested, could claim constitutional protection when other aliens cannot." David A. Martin, *Graduated Application of Constitutional Protections for Aliens*, 2001 SUP. CT. REV. 47, 48.

**B. Minaey's Case for Release Pending His Removal**

So what principle does *Zadvydas* provide for a detainee such as Minaey? Section 1231(a) anticipates some period of detention in preparation for removal. But, *Zadvydas* taught, it does not authorize "potentially permanent" detention. *Zadvydas*, 533 U.S. at 690–91; *Demore*, 538 U.S. at 528. Does that mean the Government may detain a removable alien for as long as it pleases if it can pin the delay on *some* process that will *someday* end? Is that the relevant "definite termination point?" *Demore*, 538 U.S. at 529; *Jennings*, 583 U.S. at 304 (plurality opinion). If so, that standard arguably would be satisfied in Minaey's case: Although no one knows when the Government will manage to remove Minaey to Iran, we do know that's the current plan, such as it is. *See* Schilling Decl. ¶¶ 6–7. But the facts of *Zadvydas*, and the analysis of intervening decisions, complicate that superficially straightforward assessment.

Another possibility—borne out in two Sixth Circuit decisions applying the *Zadvydas* framework—is that the Government must identify not just a *theoretical* termination point based on the conclusion of some process but an *actual* termination point that will (or likely will) arrive at some predictable point in time. In other words, in response to a threshold showing from a petitioner, the Government must build a record addressing "the likelihood of successful future negotiations" and their probable timing as the "reasonably foreseeable future … shrink[s]." *Zadvydas*, 533 U.S. at 701–02 (quotation marks omitted).

In *Martinez v. Larose*, the Sixth Circuit recognized that detention may extend well past six months if removal depends on the end of a predictable process like litigation. There, the Sixth Circuit faced the problem of prolonged detention pending withholding-only proceedings. 968 F.3d 555, 565 (6th Cir. 2020). The petitioner in *Martinez* was waiting on proceedings before the BIA (as well as the Sixth Circuit).

Once those proceedings ended, though, no apparent barrier stood in the way of his immediate removal. *See id.* So although he'd been detained for more than two years, removal remained reasonably foreseeable: aside from ordinary litigation, "nothing should impede the government from removing him." *Id.* This approach tracks the Supreme Court's emphasis in *Demore*, 538 U.S. at 529, on a "definite termination point" (in specific contrast to the open-ended nature of the proceedings in *Zadvydas*). The predictable course of litigation and the lack of other obstacles to removal satisfied the Court that although Martinez's detention lasted longer than six months, the end was at least in sight.

Other circumstances are less regular and predictable. For example: removal dependent on the result of an open-ended diplomatic process. Here the courts have looked with more skepticism on suggestions that removal is sufficiently imminent and non-speculative to justify continued lawful detention consistent with due process. In *Rosales-Garcia*, for instance, the Government explained that efforts to remove two habeas petitioners depended on diplomatic negotiations with Cuba. By the time the Sixth Circuit ruled, those negotiations had dragged on for several years with no sign of resolution. "Although the government presented evidence of … continuing negotiations with Cuba over the return of Cuban nationals excluded from the United States," the Court of Appeals "conclude[d] that there is no significant likelihood of removal in the reasonably foreseeable future." 322 F.3d at 415. "[E]vidence" of continuing negotiations alone was not, apparently, "sufficient to rebut [the threshold] showing" made by the petitioners. *Id.* (quoting *Zadvydas*, 533 U.S. at 701). In the Court of Appeals' view, that showing could be rebutted only by Government evidence that the petitioners were "currently on a list of persons to be returned." *Id.*

Minaey's case lies somewhere between these points on the spectrum between certain imminent removal and speculative future departure. His initial showing was straightforward: He'd been detained much longer than the presumptively reasonable six-month period, and the Government nevertheless offered no reason to think removal to Iran was feasible (much less imminent). *See* Reply (DN 15) at 3–5. As Minaey's reply (at 5) put it:

> At no point in the declaration does the officer elaborate on what the negotiations are nor the likelihood of success in said negotiations. … An ongoing negotiation does not mean ICE will succeed in obtaining a travel order or Iran's consent to repatriate Petitioner. The declaration poses more questions than answers: what exactly is going on within these negotiations, when did they start, how are they progressing, and most importantly, will Petitioner ever be able to secure release from custody and removal from the United States?

The Court ordered a response. *See* DN 24. But the Government's update shed precious little light on the situation:

> Iranian air space was recently opened for limited commercial flights, making removal easier. However, travel documents are still needed for such flights. ICE is still working to secure his travel documents from Iran. This is more complicated than in some cases, because Petitioner's Iranian citizenship must be proven, and here, Petitioner has been gone from Iran for years, so the proof is more difficult. Yet, to date, Iran has not refused to issue travel documents. As soon as the travel documents are received, Petitioner can be promptly removed. ICE cannot provide any additional insight as to when those documents could be expected.

DN 25 at 1–2.

The prospects for imminent removal in the foreseeable future, therefore, remain limited at best, even compared to other decisions involving pre-removal detention. In *Martinez*, the holdup was litigation related: agency adjudication of applications to withhold removal was ongoing. 968 F.3d at 558. So if the BIA affirmed that determination, no legal barrier would've stood between the petitioner's removal order and its execution; the Government could've (and presumably would've) removed him immediately. *Id.* at 565. Here, in contrast, the delay appears to be logistical and diplomatic—but otherwise unrelated to any ongoing proceedings in the U.S. immigration or judicial systems.

On the other hand, Minaey's removal negotiations are not as long running or intractable as those in *Rosales-Garcia*. There the Government had promulgated "regulations specifically … for [certain displaced] Cubans," created a Cuban Review Board to evaluate their cases, authorized special parole to relieve humanitarian concerns, and declined even to "*contend* in [that] appeal that a repatriation by Cuba of either [petitioner] [wa]s reasonably foreseeable." *Rosales-Garcia*, 968 F.3d at 391 (emphasis added); *see* 8 C.F.R. § 212.12 (2002) (creating "Cuban Review Plan").

This is not a *Martinez* situation. The challenge of executing removal, not litigation, stands between Minaey and freedom. The only remaining task, as in *Rosales-Garcia*, is for the Government to send Minaey to Iran or elsewhere. And on that point, the Government points to nothing in the record suggesting that removal is "reasonably foreseeable." *Zadvydas*, 533 U.S. at 701. Nor does the Government point to a "definite endpoint" of the sort that *Demore* used to distinguish *Zadvydas*. *See also Hamama v. Adducci*, 946 F.3d 875, 879 (6th Cir. 2020) (declining to extend *Zadvydas* to delays in the "entry of a removal order" or the "conclusion of asylum proceedings," because each of these processes "have endpoints" more definite than the diplomacy-delayed removal in *Zadvydas*). As Justice Scalia acknowledged after *Zadvydas*, the Government cannot, consistent with that decision, detain an alien

simply because it hasn't found anywhere to put him. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (Government could not justify detention "having brought forward nothing to indicate that a substantial likelihood of removal subsists despite the passage of six months"). Ongoing "repatriation negotiations" are surely a *necessary* condition for continued confinement. *Id.* But they are not a sufficient one. *See Zadvydas*, 533 U.S. at 702 (reversing the Fifth Circuit for holding that detention may continue for "as long as 'good faith efforts to effectuate … deportation continue'").

Courts must "listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue," and courts must likewise "grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." *Id.* at 700–01. A habeas petition does not oblige the Government to produce "an extant or pending repatriation agreement." *Id.* at 702 (quotation marks omitted). But the mere fact of negotiations, the Supreme Court has made clear, does not amount to reasonably foreseeable removal that would defeat a petition, either; in other words, the Government can't win with "nothing." *Clark*, 543 U.S. at 386; *see Zadvydas*, 533 U.S. at 702.

In this case, however, diplomatic and logistical delays alike apparently stymie removal. Neither has the Government built a record addressed to the likelihood and timing concerns emphasized in *Zadvydas*. The endpoint of Minaey's process, based on the Government's representations, is hard to see. Does Minaey's birth certificate exist? Is either government actually trying to find it? Months into an on-again off-again shooting conflict, is a piece of paper really the only obstacle preventing removal to Iran? The Government's submissions provide no information about the likelihood or timing of whatever efforts continue.

As Minaey points out, this presentation is quite vague considering that more than a year has passed since the Government first detained him. The Government needn't necessarily produce travel documents or an itinerary. And despite Justice Kennedy's worries in dissent, it surely needn't "cal[l] on" "[h]igh officials of the Department of State … to testify" or otherwise disclose the details of diplomatic communications. *Zadvydas*, 533 U.S. at 725. But given more than a year to operate, the Government has apparently done nothing more than identify a preferred destination.

Yet the Government (after Minaey met *his* initial burden) bears the burden of the *Zadvydas* burden-shifting framework. And it has offered little if anything to dispel the uncertainty Minaey's briefing and exhibits identify—only a stated intent to someday send him back to Iran. Of course, the Court recognizes the deference owed the Executive Branch in the conduct of foreign affairs. And it takes seriously the Government's assertions that its agencies are working on the problem. But so long after detention began, Minaey rightly asks for more than speculation that he

will someday be removed. After so much time has passed, a desultory statement that the Government is working on it does not clear the bar set by *Zadvydas* to demonstrate a "substantial likelihood" that removal will take place "in the reasonably foreseeable future." 533 U.S. at 701. The evidence (or lack thereof) in this case does nothing to dispel the worry of indefinite detention—and suggests a situation much closer to *Zadvydas* and *Rosales-Garcia* than to *Martinez*.

The unsatisfying and even perverse nature of this accumulation of caselaw is readily apparent. The judicial shot clock imposed on the executive's pre-removal detention authority effectively creates a springing right to release into this country for stateless and inadmissible detainees. As Justice Kennedy presciently noted in dissent, "by refusing to accept repatriation of their own nationals, other countries can … force [them] upon us." *Zadvydas*, 533 U.S. at 711–12. And whether district judges "can expand or contract the reasonable period of detention based on [their] own assessment of the course of negotiations with foreign powers" likewise raises eyebrows. *Id.* Within the statutory gap perceived by the Supreme Court, "the Executive [may] perform its duties on its own for six months," but "after that, foreign relations go into judicially supervised receivership." *Id.*

This is a strange conception of the separation of powers. Particularly in foreign affairs, where judicial competence and authority are generally thought to recede to their lowest ebb. And decisions before and after *Zadvydas* raise questions about the stability of these constitutional premises. *See Thuraissigiam*, 591 U.S. at 139–40 (reaffirming *Mezei*); *Martinez v. Larose*, 980 F.3d 551, 552–55 (6th Cir. 2020) (Thapar, J., concurring in denial of rehearing en banc) (questioning aspects of *Rosales-Garcia* after *Thuraissigiam*); *Rosales-Garcia*, 322 F.3d at 417–18 (Boggs, J., dissenting) (similar, before *Thuraissigiam*); *cf. Lopez-Campos v. Raycraft*, 175 F.4th 713, 759–60 (6th Cir. 2026) (Murphy, J., dissenting) (emphasizing the narrow reach of *Zadvydas* under modern caselaw).

Unless and until the appellate courts (or Congress) revisit these decisions, at least, measuring pre-removal detention along this yardstick between "reasonably foreseeable" and "effectively indefinite" appears to be a job for the district courts. And as the law stands today, the Government's bare recital that it hopes to someday get Minaey on a plane to Iran is not "sufficient to rebut" his initial showing, after months of waiting, that removal was not coming soon.

## ORDER

The Court grants, *dubitante*, the petition and directs the Government to release the Petitioner. Nothing in this order determines what "release conditions" may be appropriate for the Petitioner's "supervision." *Zadvydas*, 533 U.S. at 696.

Benjamin Beaton, District Judge
United States District Court

August 14, 2026